[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-13274
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 15, 2012
JOHN LEY
CLERK

D.C. Docket No. 7:09-cv-00141-HL


MICHELLE KEENE,
LEANNE BENNETT,
THOMAS CREWS,

                                                      Plaintiffs - Appellants,

versus

CHRIS PRINE,
Individually and in his official capacity
as Sheriff of Lowndes County, Georgia,
LOWNDES COUNTY, GEORGIA,

                                                      Defendants - Appellees.
_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(May 15, 2012)

Before WILSON and MARTIN, Circuit Judges, and VOORHEES,[*] District Judge.

PER CURIAM:

Leanne Bennett, Thomas Crews, and Michelle Keene ("the employees") appeal the district court's grant of summary judgment in favor of Sheriff Chris Prine and Lowndes County ("the County"), in their case asserting that they were wrongly terminated from their jobs at the Lowndes County Sheriff's Office. The employees allege discrimination based on their sex and age, as well as retaliation for engaging in protected political speech. In a thorough Order, the district court set forth the facts alleged in this case; so, we will not repeat those facts here. We will instead refer to specific facts as necessary for our analysis.

The employees raise three arguments on appeal. First, they assert that the district court erred in finding that Prine and the County are entitled to Eleventh Amendment immunity. Second, the employees claim that summary judgment was inappropriate because they have shown evidence from which a reasonable juror could conclude that the Sheriff's proffered reasons for their terminations were pretextual, and that their terminations were actually motivated by intentional discrimination. And, third, the employees dispute the district court's disposition

---

[*] Honorable Richard L. Voorhees, United States District Judge for the Western District of North Carolina, sitting by designation.

of their claim alleging retaliation for their First Amendment-protected political speech.

Our review of these claims is de novo. See Abusaid v. Hillsborough Cnty. Bd. of Cnty. Comm'rs, 405 F.3d 1298, 1303 (11th Cir. 2005) (reviewing state law de novo to determine whether sheriff was entitled to Eleventh Amendment immunity); Shaw v. Conn. Gen. Life Ins. Co., 353 F.3d 1276, 1282 (11th Cir. 2003) (reviewing the district court's grant of summary judgment de novo); Thaeter v. Palm Beach Cnty. Sheriff's Office, 449 F.3d 1342, 1352 (11th Cir. 2006) (reviewing de novo the district court's dismissal for failure to state a claim). We review these arguments in turn, and conclude that each is meritorious. For this reason, we reverse the district court's judgment, and remand for proceedings consistent with this opinion.

I.

To receive Eleventh Amendment immunity from suit for monetary damages, a defendant must be acting as an "arm of the state" when performing the particular function for which it is being sued. Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc). So, for Sheriff Prine and the County to receive immunity here, Prine must have been acting as "an arm of the state" when he terminated the employees.

3

In making the "arm of the state" determination, we weigh the four factors set forth in Manders, 338 F.3d at 1309. In the context of this case, we evaluate: (1) how state law defines the entity of the Sheriff's Office; (2) what degree of control the state maintains over the Sheriff's Office in making personnel decisions; (3) where the Office derives its personnel funding; and (4) who is responsible for covering judgments against the Office. Id. at 1309; see Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp., 208 F.3d 1308, 1311 (11th Cir. 2000) ("The pertinent inquiry is not into the nature of [an entity's] status in the abstract, but its function or role in a particular context."). We look to state law in conducting this analysis because the actual function of a government official, in a particular area, will necessarily depend on how the official's functions are defined by state law. See Manders, 338 F.3d at 1309. But while the powers and duties of any local or municipal officer will inevitably find their source in state law, the Manders inquiry looks beyond that fact and examines the practical orientation of the officer, asking whether he acts on behalf of the state when he performs the function at issue. Based on this analysis, we conclude that Sheriff Prine did not act as an "arm of the state" when terminating the employees, and therefore reverse the district court's decision on this point.

The first Manders factor—how state law defines the entity—points to

viewing the Sheriff's Office as an "arm of the state."  We have observed that

"[t]he essential governmental nature of the sheriff's office is to (1) enforce the law

and preserve the peace on behalf of the State and (2) perform specific duties,

directly assigned by the State, in law enforcement, state courts, and corrections."

Powell v. Barrett, 496 F.3d 1288, 1306 (11th Cir. 2007), rev'd en banc on other

grounds, 541 F.3d 1298 (11th Cir. 2008).  To be sure, Georgia law does not define

this entity unequivocally.  The sheriff is labeled a "county officer," Ga. Const. art

IX, § 1, ¶ III(a), and his jurisdiction is limited geographically to the county where

he is elected.  See Manders, 338 F.3d at 1312.  But, given that "[m]ost of [the

sheriff's] duties are an integral part of the State's criminal justice system and are

state functions," we find that Sheriff's Offices are defined and intended to be

entities that effectuate a range of functions that is primarily, if not exclusively,

oriented toward state ends.  Id. at 1319.

The second Manders factor evaluates the "degree of control the State

maintains over the entity" with respect to the particular function at issue here.  Id.

at 1309.  Notably, this inquiry does not find its resolution by comparing the

amount of state control relative to the county.  Instead, it weighs only the degree

of state control, while finding the existence and extent of county control

instructive because it reflects control of the entity not held by the state.  Though

state law affords the Governor "broad investigation and suspension powers regarding any misconduct by a sheriff in the performance of any of his duties," id. at 1321 (citing O.C.G.A. § 15-16-26), the state's supervisory authority only allows it to enforce the outermost bounds of sheriffs' conduct generally, and the state otherwise does not inject itself into sheriffs' personnel decisionmaking. Indeed, sheriffs are largely independent from the state when they make personnel decisions. See O.C.G.A. § 15-16-23 ("[S]heriffs are authorized in their discretion to appoint one or more deputies."); id. § 42-4-1(a) ("[S]heriffs . . . have the authority to appoint other jailers, subject to the supervision of the county governing authority. . . ."); see also Brown v. Dorsey, 625 S.E.2d 16, 21 (Ga. Ct. App. 2005) ("The sheriff alone has the power to hire and fire his deputies and jailors."). As a result, our assessment of sheriffs' personnel management differs from that of the use-of-force policy at issue in Manders, where we found that "only the State possesses control over sheriffs' force policy and that control is direct and significant in many areas, including training and discipline." 338 F.3d at 1320. In this realm, the sheriff's independence weighs against considering him to be acting as an "arm of the state." Cf. Abusaid, 405 F.3d at 1307 (finding that the sheriff's independence in day-to-day operations "generally weighs in favor of the county-oriented nature of the office of sheriff in Florida").

6

Third, we look to "where the entity derives its funds" for personnel matters. Manders, 338 F.3d at 1309. Under Georgia law, the county dictates, and has the power to amend, the sheriff's overall budget. See Powell, 496 F.3d at 1307 (noting that "the County sets and funds the sheriff's total budget"); Bd. of Comm'rs of Randolph Cnty. v. Wilson, 396 S.E.2d 903, 904 (Ga. 1990) ("As a county officer, the sheriff's budget and accounts are subject to the authority of the commission."). And for the most part, the County Commission sets, and county residents pay, the taxes that fund the salaries of Sheriff's Office personnel. See O.C.G.A. § 48-5-220 (providing that "[c]ounty taxes may be levied and collected . . . to pay sheriffs," among other things); see also id. § 15-16-20(a)(1) (providing that sheriffs' salary is "payable in equal monthly installments from the funds of the sheriff's county") (emphasis added). By way of comparison, state law authorizes sheriffs to hire deputies, but does not require them to do so. See O.C.G.A. § 15-16-23. That is why a county commission has the ability under state law unilaterally to cut the sheriff's budget, even though the cut represents "a substantial portion of the Sheriff's budget and will reduce the Sheriff's law enforcement capability," Chaffin v. Calhoun, 415 S.E.2d 906, 908 (Ga. 1992), and indeed even to the point where layoffs become necessary, Wilson, 396 S.E.2d at 904–05. In this case, the County is clearly the principal source of funding for the

7

Sheriff's Office,[1] including for personnel expenditures, a fact that weighs against finding that Sheriff Prine acted as an "arm of the state" here.

Fourth and finally, we consider "who is responsible for judgments against the entity." Manders, 338 F.3d at 1309. This final factor, though not alone determinative, id. at 1327, implicates the Eleventh Amendment's "core concern" that "the State [will be] in fact obligated to bear and pay" adverse judgments, Hess v. Port. Auth. Trans-Hudson Corp., 513 U.S. 30, 51, 115 S. Ct. 394, 406 (1994). This factor thus carries great weight in our analysis. See Shands, 208 F.3d at 1311 (stating that immunity is appropriate "only to the extent that a judgment would expose the [state] government to financial liability").

Here again, the independence afforded the Sheriff's Office creates something of a lacuna. Neither the state nor the county will be required to pay directly any adverse judgment against the Sheriff's Office. See Manders, 338 F.3d at 1326–27. Instead, the Sheriff's Office will have to pay out of its own general budget, which, as we have said, is composed primarily of county funds. Id. at

---

[1] Compare Dawn Castro, A sheriff's costs: A review of South Georgia sheriffs' budgets, Valdosta Daily Times, Sept. 4, 2011, available at http://valdostadailytimes.com/local/x1078449155/A-sheriff-s-costs-A-review-of-South-Georgia-sheriffs-budgets/ (estimating the Sheriff's Office budget for fiscal year 2011-2012 to be $17,991,820) with Joseph D. Pritchard, Lowndes County, Georgia: Annual Operating Budget, 139 (2011), available at http://www.lowndescounty.com/content/government/c352/misc/budget%202012%20booklet.pdf (approximating County support for the Sheriff's Office over that period to be $15,998,674).

1327. And, though both county and state funds might be implicated in the event of a substantial adverse judgment, id., any overall budgetary shortfall would more directly be met by county funds, given that state funds are largely tied to particular obligations, such as training sheriff's officers or housing felony offenders serving their state sentences in the county jail, see id. at 1320, 1327. This view comports with Georgia's political structure because, if a sheriff's office budget is being used to satisfy adverse judgments instead of to perform law enforcement activities, then it is up to the county commission to provide additional funds to the office, or to the county's voters to replace the sheriff. To the extent that the state is insulated from paying any adverse judgment against the Sheriff's Office, that entity's autonomy with respect to this "core concern" of the Eleventh Amendment weighs heavily in favor of denying immunity. Hess, 513 U.S. at 51, 115 S. Ct. at 406; Abusaid, 405 F.3d at 1312–13.

In sum, weighing the four Manders factors together leads us to conclude that, when Sheriff Prine made the personnel decisions at issue here, he did not act as an "arm of the state" for Eleventh Amendment immunity purposes.

## II.

We now consider whether the district court erred in granting summary judgment in favor of Sheriff Prine and the County on the employees' claims for

gender discrimination under Title VII and 42 U.S.C. § 1983, retaliation under Title VII, and age discrimination under the Age Discrimination in Employment Act (ADEA).[2] Each of these claims is based on circumstantial evidence, so we apply the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).[3]

Under McDonnell Douglas, the plaintiff must initially establish a prima facie case, though the elements of the prima facie case vary across statutes. Wilson, 376 F.3d at 1087, 1089 (outlining the prima facie case for a Title VII discrimination claim); see Cooper v. Southern Co., 390 F.3d 695, 740 (11th Cir. 2004) (Title VII retaliation claim), abrogated on other grounds, Ash v. Tyson Foods, Inc., 546 U.S. 454, 456–57, 126 S. Ct. 1195, 1197 (2006); Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1359 (11th Cir. 1999) (ADEA discrimination claim). In each context, however, the "burden of establishing a

---

[2] See 42 U.S.C. § 2000e-2(a) (prohibiting sex-based employment discrimination); id. § 1983 (providing relief for constitutional violations committed by state actors); id. § 2000e-3(a) (prohibiting retaliation against an employee); 29 U.S.C. §§ 623(a)(1), 631(a) (prohibiting an employer from discharging any individual 40 years of age or older "because of such individual's age").

[3] See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004); see also McCann v. Tillman, 526 F.3d 1370, 1375–76 (11th Cir. 2008) (applying a burden-shifting framework to a retaliation claim "as with [the plaintiff's] discrimination claim"); Pennington v. City of Huntsville, 261 F.3d 1262, 1265 (11th Cir. 2001) ("[C]laims under § 1983 and Title VII generally have the same elements of proof and use the same analytical framework . . . ."); Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) (applying burden-shifting to an ADEA discrimination claim).

prima facie case . . . is not onerous." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 1094 (1981).

From there, "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions." Wilson, 376 F.3d at 1087. At this stage, "[t]he employer need not persuade the [finder of fact] that it was actually motivated by the proffered reasons." Id. (quotation marks omitted). However, the defendant must "clearly set forth . . . the reasons for the plaintiff's rejection." Burdine, 450 U.S. at 255, 101 S. Ct. at 1094.

After the employer proffers a legitimate, nondiscriminatory reason for its action, the burden shifts back to the plaintiff "to offer evidence that the alleged reason . . . is a pretext for illegal discrimination." Wilson, 376 F.3d at 1087. At this last stage of the McDonnell Douglas framework, the plaintiff must persuade the finder of fact either that "a discriminatory reason more likely motivated the employer" or that "the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256, 101 S. Ct. at 1095.[4] If a plaintiff attempts to show that the proffered explanation is "unworthy of credence," she must demonstrate

---

[4] The burden of proof for ADEA claims differs from the other statutes being considered here. "[T]he ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, ___, 129 S. Ct. 2343, 2349 (2009) (emphasis added). Instead, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." Id. at 2351.

"weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's rationale. Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotations marks omitted).

If the prima facie case is met, and a reasonable jury could disbelieve the defendant-employer's proffered legitimate reason for the adverse employment action, the district court cannot grant summary judgment to the defendants. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148, 120 S. Ct. 2097, 2109 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."); see also Wilson, 376 F.3d at 1088; Combs, 106 F.3d at 1538 (stating that once a court determines that "a reasonable jury could conclude that the employer's proffered reasons were not the real reason for its decision, [it] may not preempt the jury's role of determining whether to draw an inference of intentional discrimination").

Commencing our analysis then, we reject the argument to the contrary and follow the district court in concluding that Bennett and Keene established a prima facie case for gender discrimination, and that Keene made a prima facie case for Title VII retaliation as well. With respect to whether Crews met the prima facie requirements for an ADEA claim, though we recognize that there is some dispute

about whether "a substantially younger person filled" Crews's position, Damon, 196 F.3d at 1359, at this stage we draw the inference in Crews's favor. See Reeves, 530 U.S. at 150, 120 S. Ct. at 2110 (stating that the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence"). Thus, given that Logan Henderson did not actually perform Crews's former duties while younger individuals did, we find that Crews has made the prima facie case for his ADEA claim.

In response to these initial claims, the Sheriff has articulated several legitimate, nondiscriminatory reasons for terminating the employees. So, our analysis turns on whether each employee has "cast sufficient doubt on the [Sheriff's] proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." Combs, 106 F.3d at 1538 (quotation marks omitted). We find that the employees have met this standard, and thus we conclude that summary judgment is not appropriate.

In explanation for the termination of Sgt. Bennett, Sheriff Prine has offered an account of Bennett's conduct at a campaign event, conduct which he claimed formed the basis for his opinion that she was "loud and boisterous." But Bennett

13

has, through her testimony, given evidence that could directly refute Prine's account of their interaction at the campaign event. See Munoz v. Oceanside Resorts, Inc., 223 F.3d 1340, 1345 (11th Cir. 2000) (employee testimony denying confrontation "directly contradicted" employer's testimony that he was fired for insubordinate behavior, "creating a factual conflict properly resolved by the jury"). As another reason for Bennett's termination, Sheriff Prine also pointed to his concern that Bennett's husband supervised her in the chain of command. But there is evidence that this reason rests on an implausibility, or at least a genuine weakness, because Bennett has pointed out that after her termination, her unit was transferred from under her husband's supervision. In addition, Bennett's testimony directly contests Prine's account that he offered, and that she refused, transfer to another unit. See Mora v. Jackson Mem. Found., Inc., 597 F.3d 1201, 1204 (11th Cir. 2010) (per curiam) (reversing grant of summary judgment because, where an employer and an employee testify oppositely as to the contents of a conversation, the outcome "depends on whose account of the pertinent conversations a jury would credit").

Poor performance was given as the reason for Cpt. Keene's termination. But Keene has provided evidence, including her own testimony, that directly refutes this explanation. Furthermore, there is evidence that such poor

14

performance on the part of Keene would have represented a sudden departure from Keene's history in the job, as evidenced by her pre-2008 performance evaluations, steady stream of promotions, and the favorable testimony of Sheriff Prine's predecessor.[5] The absence of documented concerns about Keene's performance, including her alleged failure to communicate, and the apparent departure from the Office's "progressive discipline" policy in firing her without first taking any less drastic disciplinary step, offer further evidence from which a reasonable juror could come to doubt the proffered reason for Keene's termination.[6]

And last, Sheriff Prine has offered numerous reasons for the termination of Lt. Crews. But Crews, too, has presented evidence from which a reasonable jury could choose to regard those reasons as "unworthy of credence." Burdine, 450 U.S. at 256, 101 S. Ct. at 1095. While Sheriff Prine and the County assert that the "length of service" rationale for Crews's termination constitutes a legitimate

---

[5] See Damon, 196 F.3d at 1361 (reversing grant of summary judgment after finding sufficient proof of pretext where, in part, "older managers with good employment histories" began receiving written reprimands); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 921 (11th Cir. 1993) (finding that plaintiff showed pretext in retaliation case when he had received good performance evaluations historically, but "received numerous unfavorable performance evaluations" after filing administrative complaints).

[6] See Wascura v. City of S. Miami, 257 F.3d 1238, 1245 (11th Cir. 2001) (stating that where the proffered reason is poor performance, "the lack of complaints or disciplinary reports in an employee's personnel file may support a finding of pretext"); see also Hill v. Seaboard Coast Line R.R. Co., 885 F.2d 804, 811 (11th Cir. 1989) (observing that an employer's deviation from standard personnel management procedures can be evidence of pretext).

15

nondiscriminatory reason, we conclude that, at least in some circumstances, such a "length of service" reason can form the basis of an ADEA claim because pension eligibility might easily be used as a proxy for age. See Hazen Paper Co. v. Biggins, 507 U.S. 604, 613, 113 S. Ct. 1701, 1707 (1993).

Prine also asserts that Crews "talked bad" about him during a campaign event; but, like Bennett, Crews directly refutes that account through his own testimony. And though Prine contends that he wanted Crews gone so that he could hire Logan Henderson, the fact that Henderson never performed Crews's duties raises a question of intent that is for a jury to resolve. Beyond that, Sheriff Prine offers no additional details or explanation for the unsubstantiated rumors concerning Crews's gambling or leaking information, admits he had no personal knowledge of Crews's performance, and has made clear that he would not rely on unattributed information to discipline an employee. See Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1299 (11th Cir. 2006) (reversing summary judgment, in part because "an employer's deviation from its own standard procedures may serve as evidence of pretext"); see also Hinson v. Clinch Cnty., Ga. Bd. of Educ., 231 F.3d 821, 831 (11th Cir. 2000) (reversing summary judgment where inference could be drawn that the proffered reason for termination was pretextual, where employer failed to raise a concern directly with the

16

employee despite generally doing so).  Perhaps most notably, none of the five reasons proffered for Crews's termination was ever provided to the Georgia Department of Labor, the POST organization, or the EEOC.  See Hurlbert, 439 F.3d at 1298–99 (reversing grant of summary judgment on FMLA claim, in part, because of evidence that the proffered reason for termination was not given on separation notice or other termination documents);  id. at 1298 (citing as evidence of pretext "an employer's failure to articulate clearly and consistently the reason for an employee's discharge")

Each employee has clearly met the proffered legitimate, nondiscriminatory reasons for her termination "head on," Wilson, 376 F.3d at 1088, by demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that would permit findings of pretext and discrimination, Combs, 106 F.3d at 1538.  We therefore reverse the district court's grant of summary judgment in favor of Sheriff Prine and the County on these claims.

## III.

Last, we conclude that the employees stated a claim for unlawful retaliation in response to protected political speech.  A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief," and a respective demand for that relief.  Fed. R. Civ. P. 8(a)(2)–(3); see also Ashcroft v.

17

Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (stating that a "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face") (quotation marks omitted).

Thus, the pleading standard set forth in Federal Rule of Civil Procedure 8 evaluates the plausibility of the facts alleged, and the notice stemming from a complaint's allegations. Where those two requirements are met, we have recognized that the form of the complaint is not significant if it alleges facts upon which relief can be granted, even if it fails to categorize correctly the legal theory giving rise to the claim. Evans v. McClain of Ga., Inc., 131 F.3d 957, 964 n.2 (11th Cir. 1997) (per curiam) (citing Dussuoy v. Gulf Coast Inv. Corp., 660 F.2d 594, 604 (5th Cir. 1981)) (quotation marks omitted); see also Hamilton v. Allen-Bradley Co., 244 F.3d 819, 823–24 (11th Cir. 2001) (finding that plaintiff stated a claim because her complaint, though "not a model of clarity," should have put the defendant on notice that the claim was being leveled against it).

Here, in addition to alleging that the employees were terminated because of their "support" for Prine's opponent in the election for Sheriff, the complaint also demanded injunctive relief requiring the Sheriff "to cease and discontinue" the "practice of considering . . . legally protected speech" in his personnel decisions. Beyond that, the complaint contained a clear claim relating to retaliation for

18

political affiliation, and alleged a set of facts pertaining to the employees' activities during the campaign for sheriff.

The facts alleged permit the plausible inference that Sheriff Prine terminated the employees in retaliation for their political speech. And these allegations were sufficient to put Prine and the County on notice as to the speech-related claims against them. As a result, we find that the employees stated an expression claim in conformity with Rule 8. Having found this, we need not address whether the district court abused its discretion in denying the employees' motion to amend.

We next consider the district court's additional, alternative conclusion that Sheriff Prine was entitled to qualified immunity because he "had lawful reasons for terminating all the Plaintiffs and that he was at least in part motivated by those reasons." In light of our finding that "a reasonable jury could conclude that [Prine's] proffered reasons were not the real reason for [his] decision," Combs, 106 F.3d at 1538, we note that the record does not "indisputably establish[] that [Prine] was motivated, at least in part, by lawful considerations," Stanley v. City of Dalton, 219 F.3d 1280, 1295 (11th Cir. 2000). As a result, we conclude that granting summary judgment on the basis of qualified immunity on this claim is not appropriate.

IV.

In light of the above conclusions, we reverse the district court's Order granting summary judgment to Sheriff Prine and the County, and remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**